### UNITED STATES of America, Plaintiff-Appellant,
### v.
### Herminia GIL de AVILA, Defendant-Appellee.

### No. 71-3033.

United States Court of Appeals, Ninth Circuit.

Oct. 6, 1972.

James W. Meyers, Asst. U. S. Atty. (argued), Stephen G. Nelson, Brian E. Michaels, Asst. U. S. Attys., Harry D. Steward, U. S. Atty., San Diego, Cal., for plaintiff-appellant.

George H. Lerg, San Diego, Cal., for defendant-appellee.

Before BARNES and TRASK, Circuit Judges, and BYRNE, Sr.,* District Judge.

WILLIAM M. BYRNE, District Judge:

As a result of a strip search of Herminia Gil de Avila (Herminia), two rubber prophylactics containing one and three quarters ounces of heroin were

---

* Honorable William M. Byrne, Sr., United States Senior District Judge, Central District of California, sitting by designation.

discovered as she "lowered her undergarments to her ankles." Despite this discovery, the district court granted Herminia's motion to suppress on the ground "that there were [no] facts to support the search of [Herminia]."

For purposes of the motion to suppress, the parties stipulated to the following: On August 22, 1971, a 1964 Chevrolet station wagon entered the United States from Mexico at the San Ysidro, California Port of Entry. Jose Avila was driving. Juana Avila was a front seat passenger. Regino Marquez and Herminia were the back seat passengers.

Other than a loaf of bread, all four occupants of the car declared they brought nothing from Mexico. As he questioned the occupants, Customs Inspector Driscoll observed that Marquez' "carotid artery was pulsating and [that] he was sweating." At the same time, Driscoll noticed that Jose Avila "was getting nervous." When Jose complied with Driscoll's request to open the rear portion of the station wagon, his throat could be seen "pulsating." Suspecting that "contraband was · hidden either in the vehicle or on the persons of the" car's occupants, Driscoll directed Jose to drive to the secondary inspection area.

At the secondary inspection area, the four went to the Customs office. There the men emptied their pockets and the women put their purses on the counter. Jose's heart was pounding so hard that Driscoll felt it as he conducted a pat down search for weapons. According to the Customs Inspector, Marquez' heart beat so hard he could "see the body motion against Marquez' shirt." Driscoll also noted needle marks on both of Marquez' arms. The inspector believed these "tracks" to be "two or three days old." In light of these observations, Driscoll believed that Jose and Marquez were concealing contraband on their persons.

Although a search of Marquez proved negative, this suspect continued to manifest signs of nervousness. Jose displayed the same manifestations after a search of his person also proved negative.

Thereafter, Driscoll asked Juana Avila to hold out her arms. As she complied, her hands trembled and "her demeanor reflected that she was quite nervous and frightened." Inspector Driscoll observed Herminia to be apprehensive. Suspecting that one or both of the women was concealing contraband, Driscoll requested an inspectress to search the suspects. He believed such a search was necessary because "narcotics addicts [often use] people accompanying them across the border to carry their contraband."

The matron's search of Juana proved negative. Although no contraband was discovered, Juana remained nervous as she answered questions listed on the personal search report. As Juana left the room, she was observed by the matron to be visibly nervous.

When Herminia was brought to the search room, she refused to disrobe as requested. When the matron again asked that she disrobe, Herminia turned her back and began to undress. As Herminia undressed, the matron "heard some paper rattling—like a paper towel being crumpled." The matron heard the same sound when Herminia "lowered her undergarments to her ankles." When Herminia refused to turn over the package, the matron "reached into the clothing and seized a coarsely weaved green paper towel containing" the two rubber prophylactics.

In Henderson v. United States, 390 F. 2d 805, 808 (CA 9, 1967), this court stated that although probable cause was not required to institute a border search, more than "mere suspicion" was needed to justify initiating a strip search. In the court's view, a customs official needed to have "at least a real suspicion, directed specifically to that person" before such a search could be sustained. In United States v. Guadalupe-Garza, 421 F.2d 876 (CA 9, 1970),

Judge Hufstedler delineated the meaning of the words "real suspicion":

"'Real suspicion' justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law." 421 F.2d at 879.

In applying this definition to the facts of *Guadalupe-Garza,* the court held that the following did not constitute "real suspicion": The defendant entered the United States from Mexico at Calexico, California. He was stopped at the primary inspection area, answered routine questions and was sent on his way. A customs inspector at the secondary inspection point observed the defendant passing through the pedestrian inspection line. The defendant came within five feet of this inspector and then "tilted his head" and "shied away from" him. At the inspector's request, the defendant went to the customs office. There, the defendant appeared nervous as he answered routine questions. The inspector then ordered a strip search of the defendant. In the words of Judge Hufstedler:

"There was no evidence that appellant appeared to be under the influence of drugs when he attempted to cross the border. Customs officials had no information about him from anyone before he was searched. Observation of appellant's arms showing marks and appellant's evasive answers were not made and elicited until after appellant had been stripped.

"We conclude that the objective facts did not warrant a real suspicion that appellant was concealing something on his person. Inspector Baker had a hunch about appellant based upon appellant's skittish demeanor as he was passing through customs." 421 F.2d at 879.

Pursuant to the definition announced in *Guadalupe-Garza,* a divided panel of this circuit has recently invalidated a strip search. In United States v. Johnson, 425 F.2d 630 (CA 9, 1970), a customs inspector with considerable experience in examining persons crossing the border with concealed narcotics, ordered a strip search of the defendant after talking with her and a companion as they entered the United States. The inspector ordered the search because he was "suspicious." The divided court, in a *per curiam* opinion held there were no "'objective, articulable facts' in the record to support Inspector McCown's suspicion. If such facts existed, it was incumbent upon the government to prove them." 425 F.2d at 632.

By contrast in United States v. Shields, 453 F.2d 1235, 1236 (CA 9, 1972), the court sustained a strip search at the border because the defendant's nervousness, the presence of needle marks on her arms as well as on the arms of her *companion* and the brevity of "their visit" were "'objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect' that she was concealing contraband on her body." Here, the trial court found that as to Herminia's companions "there were the necessary objective articulable facts supporting the search" of their persons, but that there were no such facts which specifically related to Herminia. Accordingly, it refused to sustain the strip search which resulted in the discovery of heroin.

 In our view, the strip search in question was clearly within the definition of "real suspicion" as formulated in *Guadalupe-Garza.* As indicated from *Shields,* evidence relating to the companions of the subject of the strip search can be considered in determining when such a search may be justified. Here, the extreme nervous manifestations of Herminia's three companions as well as the presence of needle marks on the arms of one of the men coupled with Herminia's uncontrolled expressions of

apprehension clearly are facts to be considered in determining the presence of "real suspicion" as to each member of the group including Herminia. The trial court erred in granting the motion to suppress.

Reversed.