**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Judi Ann HOLTZ, Defendant-Appellant.**

**No. 72–1965.**

United States Court of Appeals,
Ninth Circuit.

April 18, 1973.

Ely, Circuit Judge, filed dissenting opinion.

James E. Dalzell (argued), Tucson, Ariz., for defendant-appellant.

Sarah Ann Bailey, Asst. U. S. Atty. (argued), William C. Smitherman, U. S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before ELY and WALLACE, Circuit Judges, and SOLOMON,* District Judge.

WALLACE, Circuit Judge:

Judi Ann Holtz appeals her conviction for smuggling merchandise in violation of 18 U.S.C. § 545. After her not-guilty plea and denial of her motion to suppress evidence, she waived a jury and, subsequent to trial, the court found her guilty. We affirm.

On February 2, 1972, Holtz crossed the border at Nogales, Arizona, in an automobile with two male companions. At the port of entry, an inspector questioned the three, noticed they were unkempt, anxious and uneasy and directed them to the secondary area of inspection.

At secondary, another inspector noticed that one of the men was very nervous and "strung out" and that he kept blinking his eyes. He observed that the driver was suspicious-looking and subdued and that Holtz also seemed nervous. He became more suspicious when he noted that the car had New Mexico license plates, yet the occupants had no luggage and had declared no purchases. He ordered all three out of the car and commenced to search it. Although he found nothing, he thought he could smell marijuana. He then searched Holtz's purse and found a contraceptive. Con-

* Honorable Gus J. Solomon, United States District Judge, Portland, Oregon, sitting by designation.

currently, he noticed that one of the men was increasingly nervous.

He next asked all three for identification. The men had none, but all three gave a name and address. He entered this information into a Bureau of Customs computer which identified one of the men as a known associate of a heroin dealer in New Mexico. At this point, the inspector called for assistance from another inspector. They examined the arms of both men and found fresh needle marks. A strip search of the two men was then conducted, but no contraband was found. During the strip search, one of the men became so sick that he vomited.

The officers then ordered a strip search of Holtz. The inspectress conducting the search required Holtz to take off her clothes. As part of the search, she asked Holtz to bend over and spread her buttocks; then she saw part of a rubber prophylactic hanging down from Holtz's vaginal area. The inspectress stated that the prophylactic was readily viewable and that she finished removing it from Holtz's vagina.

Tests later determined that the prophylactic contained heroin. This heroin was the basis of the merchandise count. Holtz's motion to suppress was denied and the heroin was introduced into evidence against her.

In her appeal, Holtz raises two issues. First she asserts that there were no objective, articulable facts, derived from *her* actions and appearance which produced a real suspicion justifying a strip or skin search. Second, and alternatively, she argues that this was in fact a body cavity search and that, even if

there were such a real suspicion, there was not the required clear indication that she was carrying contraband.

 Her first contention misconstrues the effect of our prior cases. Admittedly, objective articulable facts are required for a strip search. United States v. Guadalupe-Garza, 421 F.2d 876, 879 (9th Cir. 1970); Henderson v. United States, 390 F.2d 805, 808 (9th Cir. 1967). Further, the required real suspicion must be directed specifically at the person to be searched. *Henderson, supra* at 808. However, we have not limited the perimeters from which the objective articulable facts may be taken. Indistinguishable from this case is our holding that those facts derived from "the companions of the subject of the strip search can be considered in determining when such a search may be justified." United States v. Gil de Avila, 468 F.2d 184, 186 (9th Cir. 1972). *See* United States v. Shields, 453 F.2d 1235, 1236 (9th Cir.), cert. denied, 406 U.S. 910, 92 S.Ct. 1615, 31 L.Ed.2d 821 (1972). Here, the nervousness of Holtz and her companions, the fact that one was a known associate of a heroin dealer in New Mexico, the New Mexico car without luggage or purchases, and the fresh needle marks on the companions' arms are objective facts to be considered by an experienced customs inspector. Suspicion further focused on Holtz when a strip search demonstrated that her companions were not carrying contraband. When coupled with the inspector's personal knowledge that male users or addicts commonly use a female companion as a carrier, there existed the necessary real suspicion which permitted a strip search of Holtz.[1]

---

1. This court upheld the strip search in *Gil de Avila, supra,* on quite similar facts. In analyzing whether the test of real suspicion was met, the dissent inadvertently failed to specify that Holtz's companions were nervous and one was "strung out;" the absence of luggage; the detection of an odor of marijuana; the lack of any identification; the information received from the computer; the fresh needle marks on Holtz's companions; and the vomiting by one of them. Any one of the factual findings (as the appearance of a condom in Holtz's purse) may not necessarily point towards the conclusion of attempted smuggling. But it is the totality of facts before an experienced inspector which leads to the real suspicion. The concern of the dissent that Holtz suffers from her choice of companions overlooks our holding in *Gil de Avila.*

Consequently, we consider her alternative contention. Its resolution turns on the question of where a strip search ends and a body cavity search begins. She argues that the search was in fact a vaginal or body cavity search, that a mere real suspicion will not support such a search and that the required clear indication was absent. *See Henderson, supra*, 390 F.2d at 808. The government asserts that the inspectress searched no more than the skin area near the vagina, that there was no body cavity search and that a real suspicion was sufficient. At first blush, the arguments of both parties appear to find support in our prior decisions. However, a close reading of those cases indicates that the search in this case was not a body cavity search and, therefore, this search must be upheld.

One of the first important cases which touches upon the demarcation between the two types of searches was Rivas v. United States, 368 F.2d 703 (9th Cir. 1966), cert. denied, 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967). Customs officers conducted a strip search of Rivas, but he refused to spread the cheeks of his buttocks to permit an observation of his rectum. Later officers restrained Rivas while a doctor conducted a rectal examination with gentle probing. The doctor found and extracted from Rivas's rectum a rubber-enclosed packet of Percodan tablets, a narcotic. This court upheld the search. In defining the test to be applied, we held that "a search involving *an intrusion beyond the body's surface*" required a clear indication or plain suggestion. *Id.* at 710 (emphasis added).

Our next significant case, and upon which Holtz primarily relies, was Henderson v. United States, *supra*. Mrs. Henderson was stopped at the border, taken to the customs office and then to a room, and required to take off her clothes. An inspectress "made a visual examination of her body and demanded that she bend over and, with her hands pull her buttocks apart and up *to permit inspection of her vagina*." 390 F.2d at 809 (emphasis added). Mrs. Henderson refused to do so and the inspectress concluded she was hiding something. She was then taken to a doctor who forcefully extracted about three ounces of heroin from her vagina.

This court overturned the search by the inspectress finding that it violated the Fourth Amendment. We held that "if in the course of the search of a woman there is to be a requirement that she *manually open her vagina* for visual inspection to see if she has something concealed *there*, we think that we should require more than a mere suspicion." 390 F.2d at 808 (emphasis added). That the decision turned upon the requirement of a manual opening of the vagina is clear from its reliance upon *Rivas, supra*, and Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Each of those cases involved an intrusion *into the body*, and each required a clear indication as a justification. Furthermore, in *Henderson* we noted that the inspectress had not found "anything, such as vaseline, around her vagina." 390 F.2d at 809. Thus *Henderson* did not rule invalid a visual inspection of the surface of the vaginal area. Only an examination by means of a manual or visual intrusion into the cavity itself was forbidden, absent a clear indication.[2]

The pattern of our subsequent cases has maintained the differentiation between the two types of searches developed in *Rivas* and *Henderson*. For example, cases involving anal searches have consistently allowed inspection of the area around the rectum as part of a strip search, yet have required satisfaction of the clear indication test for a probe of the cavity itself. *See* United

---

2. The dissent in *Henderson* also described the body cavity search as one "involving intrusion beyond the body's surface." 390 F.2d at 811.

States v. Sosa, 469 F.2d 271 (9th Cir. 1972); United States v. Velasquez, 469 F.2d 264 (9th Cir. 1972); United States v. Summerfield, 421 F.2d 684 (9th Cir. 1970); United States v. Castle, 409 F.2d 1347 (9th Cir.), cert. denied, 396 U.S. 975, 90 S.Ct. 443, 24 L.Ed.2d 443 (1969). In *Sosa* the strip search included a request that the defendant spread his buttocks and there was a subsequent observation of grease on them. 469 F. 2d at 272. We specifically held that "inspection of the surface of the body in the anal area is permissible in a skin search." *Id.* at 273. In *Velasquez* we reached the same result. 469 F.2d at 266. In *Summerfield* we noted that certain evidence of narcotics usage "plus the sight of foreign material in appellant's rectum during the skin search constituted the 'clear indication' necessary" for a later rectal probe. 421 F.2d at 685. Finally, in *Castle, during the strip search,* an agent "wiped the area of the defendant's rectum" and detected "an oily substance which resembled vaseline." 409 F.2d at 1348. This evidence, together with other reliable information, provided the necessary clear indication for a doctor's rectal examination.

In these cases, we have allowed, as part of the strip search, a spreading of the buttocks and a visual observation of the area of the rectum. Furthermore, we have allowed the evidence gained while viewing the rectal area during the strip search to assist in providing the clear indication required for a subsequent body cavity search or probe.[3] These cases clearly indicate that requiring Holtz to bend over and spread her

buttocks would be part of a strip search and that a subsequent observation of the area thus exposed would not be a body cavity inspection. With Holtz in this position, the inspectress saw an object protruding from her vagina. Obviously the inspectress need not have confined her gaze to the rectal area. Contraband could have been taped to Holtz's thigh or crotch, which also are not body cavities. Therefore, it would be anomalous and inconsistent with our other Fourth Amendment cases if we were to uphold an initial rectal area view yet overturn a further observation and seizure of an object in plain view.

Our prior cases involving vaginal searches are not inconsistent with this holding. In Morales v. United States, 406 F.2d 1298 (9th Cir. 1969), we held the seized evidence inadmissible because a clear indication was lacking. The customs officials in that case required the defendant "to bend over and expose her vaginal area." 406 F.2d at 1299. Relying upon *Henderson, supra,*[4] we held "that when the cavity to be searched is a vagina," a clear indication must exist. 406 F.2d at 1299–1300. Unfortunately, the *Morales* decision does not explain how the defendant exposed her vaginal area.[5] *That is too bad.*

This case differs from *Morales* in that there is no evidence that this inspectress was in the process of a vaginal cavity search. The facts of this case are closer to those of United States v. Shields, *supra.* There we upheld the seizure of a condom which was observed partly protruding from the suspect's vagina. That case involved an inspection which "was confined to the surface of appellant's

---

3. These later cases are consistent not only with *Henderson* and *Rivas, supra,* but also with older cases. *See* Denton v. United States, 310 F.2d 129 (9th Cir. 1962); Murgia v. United States, 285 F.2d 14 (9th Cir. 1960), cert. denied, 366 U.S. 977, 81 S.Ct. 1946, 6 L.Ed.2d 1265 (1961); Blackford v. United States, 247 F.2d 745 (9th Cir. 1957), cert. denied, 356 U.S. 914, 78 S.Ct. 672, 2 L.Ed.2d 586 (1958).

4. *Henderson* stated the rule that, where "there is to be a requirement that she manually open her vagina for visual inspection," the body cavity test must be met. 390 F.2d at 808.

5. This court has noted before the ambiguity of the factual description in *Morales.* *See Shields, supra,* 453 F.2d at 1237.

body—excluding the vaginal area—until after the protruding condom was observed." 453 F.2d at 1237.

In the present case, Holtz was required to bend over and spread her buttocks. The inspectress then saw a prophylactic hanging down from her vaginal area. There was no evidence that Holtz was requested to or that her actions exposed the vaginal cavity itself to the invasion and intrusion regulated by *Rivas* and *Schmerber, supra.* There was no evidence that Holtz manually opened her vagina as in *Henderson* and *Morales, supra.* And finally, there is no basis in the present facts for distinguishing the anal search cases such as *Sosa, Velasquez, Summerfield* and *Castle, supra.* Therefore, we hold that the discovery of the prophylactic here occurred during a strip search and that only a real suspicion was necessary. That test was adequately met.

Affirmed.

ELY, Circuit Judge (dissenting):

I respectfully dissent. Here, again, we confront a disgusting and saddening episode at the Mexican border involving the disrobing and search of a woman by United States border police. That the woman so degraded herself as to offend the sensibilities of any decent citizen is not questioned. Nevertheless, if we are to continue to safeguard the innocent and virtuous from the potential degradation and humiliation of "strip searches", we cannot permit our revulsion at one woman's acts to induce our Court to depart from its established principles. "It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." United States v. Rabinowitz, 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting).

In 1969, I took note of

"the disturbing, even appalling, information that '80 to 85 percent', *at*

*least four fifths*, of all border transients whose bodily cavities are invaded by the border police are innocent of the suspected wrongdoing.[1] Morales

1. These statistics reflect the experience of a physician, who according to the records of our court, frequently assists the border police in their searches of bodily cavities. I think it not unreasonable to believe that in situations wherein the police may not seek medical assistance, an even greater percentage of innocent persons are offended.

v. United States, 406 F.2d 1298, 1300 n. 2 (9th Cir. 1969)."

Thompson v. United States, 411 F.2d 946, 948 (9th Cir. 1969) (original emphasis). Now, four years later, we have updated information. Recent hearings conducted by California's Representative Edward Roybal disclosed the following information drawn from an available sample:

"[O]f the 1,800 women stripped and searched [during a certain period] only 285 [approximately *16 percent*] were found carrying any contraband, and very few concealing it in body cavities.

. . . . . .

"[S]everal women testifed that they were subjected to humiliating body cavity probes by *nonmedical personnel under the most unsanitary conditions.*"

Metropolitan News, June 28, 1972, at 1, col. 3 (emphasis added). The distinguished Congressman reached this conclusion:

"It became evident from the testimony presented not only by the accusers but by customs officials as well that the procedures used at the border have failed to protect a person's right to privacy. .' . ."

*Id.*

I remain firmly persuaded that rudimentary concepts of fundamental fair-

ness, the right to be free from unreasonable searches and seizures, and the right of privacy emanating from various constitutional guarantees compel antecedent judicial authorization for a border cavity search.[1] Authorization would not, of course, be conditioned upon a finding of probable cause but only upon a showing of a clear indication or plain suggestion that contraband may be located in a body cavity. Thompson v. United States, *supra*, at 947; Huguez v. United States, 406 F.2d 366, 383, 384 (9th Cir. 1968) (concurring opinion); Blefare v. United States, 362 F.2d 870, 880–888 (9th Cir. 1966) (dissenting opinion). While our Court has not yet adopted this view, it is encouraging to note the number of commentators who share my position. *E. g.,* Comment, Intrusive. Border Searches—Is Judicial Control Desirable? 115 U.Pa.L.Rev. 276 (1966); Note, 21 Rutgers L.Rev. 513 (1967); 18 Case W.Res.L.Rev. 1007 (1967); 19 Fla.L.Rev. 374 (1966). *See* Note, Border Searches and the Fourth Amendment, 77 Yale L.J. 1007 (1968). While the Supreme Court has not yet chosen to address this problem, my position is, I believe, suggested by dicta in Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966):

> "[W]e are satisfied that the test chosen [extraction of blood samples] to measure petitioner's blood-alcohol level was a reasonable one. . . . [F]or most people *the procedure involves virtually no risk, trauma, or pain.* Petitioner is not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing.
>
> . . .
>
> "Finally, the record shows that the test was performed in a reasonable

manner. Petitioner's blood was taken by physician in a hospital environment according to accepted medical practices. We are thus not presented with the *serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment— for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.*

> " . . . *The integrity of an individual's person is a cherished value of our society.* That we today hold that the Constitution does *not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions."*

384 U.S. at 771–772, 86 S.Ct. at 1836 (emphasis added) (footnotes omitted).

I am well aware, of course, that the search challenged here was, at least at its inception, a strip search and not a cavity probe, and that, consequently, reasonableness must be measured against strip search standards. *Compare, e. g.,* United States v. Guadalupe-Garza, 421 F.2d 876 (9th Cir. 1970) (strip search) *with* Henderson v. United States, 390 F.2d 805 (9th Cir. 1967) (cavity probe). But I am equally aware that a strip search presents similar potential for abuse. Moreover, it requires no exceptional imagination to recognize that the judicial demarcation between justification for strip searches and cavity probes may, to the average border po-

---

1. I think, moreover, that my Brothers may have overlooked the significant threat to our national fiscal interest. It is not unlikely that many victims of border abuse have legitimate claims for substantial damages against our Government. *See* District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) (dictum); Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

liceman, likely become obscure. That strip searches sometimes, according to the police seem to "reveal" objects protruding from cavities, thereby obviating the stricter requirements for cavity probes, does not assuage my concern for the countless numbers of innocent travelers who may be subjected to abusive humiliation.

In undertaking to protect innocent men and women, our Court has adopted stringent requirements for a strip search. In United States v. Guadalupe-Garza, 421 F.2d 876, 879 (9th Cir. 1970) (emphasis added), Judge Hufstedler, for our Court, wrote:

"In Henderson v. United States (9th Cir. 1967) 390 F.2d 805, 808, we recognized that, even though probable cause is not required to initiate a border search, 'mere suspicion' would not justify initiating a strip search. The customs official must have 'at least a real suspicion, directed specifically to that person,' to sustain such a search. But neither *Henderson* nor our decisions following it have further defined the 'real suspicion' test stated there. We do so now.

" 'Real suspicion' justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law.

"The objective, articulable facts must bear some reasonable relationship to suspicion that *something is concealed on the body of the person to be searched*; otherwise, the scope of the search is not related to the justification for its initiation, as it must be to meet the reasonableness standard of the Fourth Amendment." [Citing Terry v. Ohio, 392 U.S. 1, 29, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Warden

v. Hayden, 387 U.S. 294, 310, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (Fortas, J., concurring)].

While the record before us may give rise to a reasonable suspicion that appellant was keeping company with undesirable characters, I cannot perceive sufficient "objective articulable facts [that bore] some reasonable relationship to suspicion that something was concealed *on the body* . . ." of appellant. Surely her nervousness could not be such a fact, for I daresay even the most law-abiding travelers are often nervous in the presence of border guards. Many fear, if not denudation and the possible gouging and probing of their recta and vaginae, the possibility that they may have innocently forgotten to declare some small foreign article placed in their ransacked luggage. The majority also notes with significance that the automobile in which appellant was riding bore out-of-state license plates and that appellant made no purchases in Mexico. It frankly escapes me how these admittedly objective facts gave rise to a reasonable suspicion that the appellant was concealing contraband on her person.

Finally, my Brothers appear to ascribe some importance to the discovery of a condom in the woman's purse. To infer from this that another contraceptive containing contraband might have been concealed within one of her body cavities reflects either startling naiveté or an unwillingness to recognize the sexual mores of many of our citizens in these times. Moreover, even if the inference be possible, it is irrelevant to the reasonableness of a strip search, since such a limited search could never confirm or dissipate the suspicion arguably raised.

Appellant was, in effect, stripped and searched because of her nervousness, her choice of companions, and her decision not to buy any souvenirs in Mexico. If these be objective, articulable facts sufficient to justify one of the most over-

whelming personal incursions allowable under law, then the dignity and sanctity of the individual in our society stand gravely threatened.[2]

I would reverse.

---

2. The second paragraph in the majority's first footnote, which was added after my dissent was originally circulated, serves —if no other purpose—to emphasize the substance of my greatest concern. If the addition is intended to bolster the majority's legal posture by fleshing out our Circuit's definition of "objective, articulable facts", then the impetus is misdirected. I have little doubt that, as my Brother Wallace ably and carefully observes, prior decisions of this Court demonstrate that the combination of factors cited by the majority constitute "objective, articulable facts", sufficient under our Court's current approach, to legitimize the search of appellant. But the focus of my concern is that the flimsy cast some of our decisions, including the majority's opinion here, have given to "objective, articulable facts" provides the innocent with but a fragile shield with which to fend off offensive, if not abusive, bodily invasions by the border police.