**UNITED STATES of America, Plaintiff,**

v.

**Silas ONYEMA, Defendant.**

**No. CR–90–521.**

United States District Court, E.D. New York.

June 5, 1991.

luggage at the Customs area, as well as a brief questioning by the attending Customs Inspector, revealed facts sufficient to arouse a reasonable suspicion that Mr. Onyema was attempting to import narcotics into the United States and, given stomach medication found in his luggage and the absence of any visible contraband, that he was carrying the drugs in his alimentary tract. The Customs Inspector informed Mr. Onyema of his suspicions and asked him to consent to an x-ray. Upon hearing this accusation, Mr. Onyema became extremely agitated and verbally abusive and asked to see an attorney. He was then escorted by the Customs Inspector and another customs official to a private customs search room and asked to take a seat. Mr. Onyema began to sit but sprang up immediately, pushed the official and kicked the inspector in the shin. The two then subdued the screaming Mr. Onyema, restrained him by handcuffing his arms behind his back and read him the Miranda warnings.

At this point, the rather ordinary and customary (if somewhat excited) border search and seizure changed character dramatically. Mr. Onyema was driven to a two-level trailer that housed twelve hospital beds—a so-called "medical van"—so that the Customs Inspectors could monitor his bowel movements. All requests to make a telephone call, either to an attorney or to anyone who might be expecting his arrival, were denied. When he entered the trailer, Mr. Onyema was asked to remove his clothing and was given a hospital gown to wear. He was then instructed to lie on one of the beds and was shackled to the frame hand and foot, one wrist handcuffed to the side of the bed and an ankle chained to the frame using a leg iron. A group of Customs Inspectors then took shifts waiting for Mr. Onyema to move his bowels and confirm his guilt or innocence and, if the former, to deliver up all the contraband.

When Mr. Onyema indicated that he needed to use a bathroom, he was released from the bed, the handcuffs were removed and his legs were shackled together with the leg iron. He was then directed to sit

Richard W. Levitt, New York City, for plaintiff.

Stanley Okula, Asst. U.S. Atty., Brooklyn, N.Y., for defendant.

## MEMORANDUM

KORMAN, District Judge.

On June 6, 1990, Silas Onyema arrived at John F. Kennedy Airport ("JFK") on Nigerian Airlines Flight 850. Review of Mr. Onyema's documents and the search of his

on a "portable potty" and relieve himself, under the watchful eye of the Customs Inspectors, one of whom sat in front of Mr. Onyema at a distance of one and one half feet. In this manner, at approximately 3:30 a.m., Mr. Onyema had the first bowel movement of his detention, some nineteen hours after he had been first brought to the trailer.

When Mr. Onyema finished his bowel movement, he was directed to take the filled bucket portion of the "potty" to a bathroom sink in the trailer and instructed to pour the feces into the sink and to wash the feces and separate the foreign objects. The process disclosed thirty five balloons or condoms wrapped in black electrical tape. Mr. Onyema was then asked to wash and dry these condoms, and to place them inside a plastic evidence bag. A field test later confirmed that the condoms contained heroin. After he had completed this procedure, Mr. Onyema was returned to the hospital bed, reshackled, advised again of his Miranda rights and placed formally under arrest.

This formal arrest, however, did not affect the conditions of his confinement. Mr. Onyema was held incommunicado, shackled to a hospital bed, and without any review by a judicial officer, until he had at least two clear stools. Although his bowel movements were regular—indeed fairly frequent—after the first one, the process which was not completed until some 78 hours after he was first locked away in the van. At approximately 2:30 p.m. on June 9, 1990, Mr. Onyema was removed from the van to the JFK medical facility where an x-ray was taken and Mr. Onyema's intestinal tract determined to be empty. Mr. Onyema was then transported to the Drug Enforcement Agency office at JFK where he was processed and later transported to the Manhattan Correctional Center.

On May 3, 1991, after the defendant was convicted of importing heroin into the United States from Nigeria, his motion to suppress the evidence used to obtain his conviction was granted, and a new trial was ordered. The purpose of this memorandum is to set forth in detail the reasons for the suppression order.

## DISCUSSION

The instant case demands a response to the compelling question that was raised by Justice Brennan in his dissenting opinion in *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), and that was left unanswered by the majority opinion in that case and by subsequent decisions.

> Does the Fourth Amendment permit an international traveler, citizen or alien, to be subjected to the sort of treatment that occurred in this case without the sanction of a judicial officer and based on nothing more than the "reasonable suspicion" of low-ranking investigative officers that something might be amiss?

*Id.* at 549, 105 S.Ct. at 3315 (Brennan, J., dissenting).

The issues that animate Justice Brennan's question spring from the growing phenomenon of men and women crossing our national borders with illegal narcotic drugs hidden in their alimentary canals. This phenomenon has fundamentally altered the character of the traditional, routine border search and detention—the stopping of travelers at border checkpoints, the routine searching of the persons and effects of entrants by customs officials, the occasional quarantining of individuals suspected of carrying disease—that served as the model upon which the Fourth Amendment jurisprudence concerning border searches has evolved. With that model in mind, the Supreme Court has consistently granted customs officials broad summary authority to search and detain travelers without probable cause and a warrant. *See United States v. Ramsey*, 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977); *Carroll v. United States*, 267 U.S. 132, 153–54, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925); *Boyd v. United States*, 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886). The jurisprudence that served well the classical routine border search and detention has, however, been subject to increasing stress, as alimentary canal

smuggling has obligated the Customs Inspectors to undertake increasingly invasive searches and detentions to confirm or dispel suspicions that a given traveler is importing narcotics.

One aspect of this stress was addressed in *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). In *Montoya de Hernandez*, the Supreme Court examined the standard of suspicion that the Fourth Amendment requires to ensure the reasonableness of an extended warrantless detention at the United States border of a traveler suspected of carrying narcotics in her alimentary canal. The defendant, Rosa Montoya de Hernandez, was held in circumstances far less severe than those of the present case: Ms. Hernandez, a woman travelling from Bogota, Colombia, was detained (but not shackled) on suspicion of alimentary canal smuggling in a locked room furnished only with hard chairs and a table, and she was offered a wastebasket as a makeshift toilet. Her repeated requests to place a telephone call were refused. After waiting nearly sixteen hours for the defendant's bowels to move, the Customs Inspectors finally sought judicial authorization for an x-ray and a rectal examination of the defendant, which order arrived some eight hours later. The rectal examination disclosed a balloon containing cocaine, one of eighty eight that ultimately passed from her body, and Ms. Hernandez was placed formally under arrest. She was later convicted at trial.

On appeal from her conviction, Ms. Hernandez argued that the district court had erred in failing to suppress the eighty eight balloons of cocaine that the government had introduced into evidence. The Court of Appeals for the Ninth Circuit agreed with her, holding that the "evidence available to the customs officers when they decided to hold de Hernandez for continued observa-

tions was insufficient to support the 16–hour detention." *United States v. Montoya de Hernandez*, 731 F.2d 1369, 1373 (9th Cir.1984). The Supreme Court reversed.

In an opinion by the present Chief Justice, the Supreme Court rejected the effort of the Court of Appeals to fix the "clear indication" standard as the standard of proof mandated by the Fourth Amendment for an extended customs detention. The majority held that "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." *Montoya de Hernandez*, 473 U.S. 531, 541, 105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 (1985).[1] Because of the relatively narrow focus on the level-of-suspicion issues, the Supreme Court was able to avert its gaze from some of the more troubling questions that hovered around the defendant's detention, including the question—critical for the present case—raised by Justice Brennan in his dissent. Indeed, the persuasive arguments advanced by Justice Brennan for some kind of judicial authorization requirement failed to elicit any response from the *Montoya de Hernandez* majority.

In the present case, the United States Attorney suggests that *Montoya de Hernandez's* nondiscussion of judicial authorization justifies the lengthy incommunicado detention of Mr. Onyema. *See* Government's Letter Brief (April 26, 1991). This silence, however, does not compel the position for which the United States Attorney here argues. Indeed, it may simply reflect the fact that the warrant issue

was not a question in dispute in the particular case. The defendant, after all, had prevailed in the court of appeals on

---

**1.** In the instant case, the Customs Inspectors had ample grounds for reasonable suspicion. The combination of Mr. Onyema's initial nervousness, his later violence, the stomach medication found in his luggage, the credit card found among his effects in the name of Anthony F. Ezema about which he gave unlikely and clearly untruthful accounts, his repeated jour-

neys between Nigeria and the United States and his refusal to submit voluntarily to an x-ray suggested strongly that he was an internal smuggler. *See United States v. Asbury*, 586 F.2d 973, 976–77 (2d Cir.1978) (listing twelve factors that may be taken into account in determining the reasonableness of border stops and searches).

the ground that there was insufficient evidence for the detention, and the *de Hernandez* majority defined the issues to be decided only in terms of "what level of suspicion would justify" a more extended seizure at the border and whether the detention which occurred was "reasonably related in scope" to the original justification.

W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.5(b), at 723 (2d ed. 1987). In fact, Ms. Hernandez's brief to the Supreme Court failed even to argue that the Fourth Amendment requires a judicial review of the evidence justifying an extended border detention, contending only that "[t]he Ninth Circuit rule, which holds that a warrant is merely one factor to be considered in determining the reasonableness of the search, is sound policy, and is firmly grounded in common sense based upon practical experience." Brief for Respondent at n. 50. In short, the Supreme Court was not required to address the issue raised in Justice Brennan's dissenting opinion, and it did not do so. Accordingly, the decision to withhold comment is not dispositive of the matter as it applies to the present case. *See Jenkins v. Delaware*, 395 U.S. 213, 216, 89 S.Ct. 1677, 1679, 23 L.Ed.2d 253 (1969) ("That there was language ... supporting the positions of both petitioner and respondent demonstrates what some courts and commentators have readily recognized: in that decision, we did not consider the [question]. The issue simply was not presented.").

The question of judicial authorization was left similarly unresolved by the recent decision in *United States v. Odofin*, 929 F.2d 56 (2d Cir.1991). In *Odofin*, the defendant was detained at the border and held incommunicado and without a warrant on suspicions of smuggling narcotics in his alimentary canal. After five days, his attorney appeared before a Magistrate who reviewed the evidence supporting the officials' reasonable suspicion and approved the continued detention until there was either an x-ray or a bowel movement, the latter of which failed to occur for a record-breaking twenty four days. On the twentieth day, Judge Sifton issued an order permitting officials at the hospital where Odofin was being held to take any medical steps that might become necessary to save Odofin's life. Four days later, Mr. Odofin passed four balloons containing heroin. While *Odofin* may be read as supporting the position that a person may be detained for at least five days without judicial authorization, it also contains language indicating that the ruling was restricted to "the unusual facts of this case." *Id.* at 58. Indeed, the Court of Appeals expressly indicated that "[w]hether an earlier line should be drawn, and where, must await another day." *See id.* at 60 n. 9.

Although the opinions of *Montoya de Hernandez* and *Odofin* are not dispositive with regard to the issue of judicial authorization, the substantive analysis in *Montoya de Hernandez* does offer helpful guidance. In particular, the principles that Chief Justice Rehnquist cites in *Montoya de Hernandez* to justify the lower level-of-suspicion requirement support, on the whole, the view that the Fourth Amendment requires some kind of judicial authorization for an extended border detention such as the one here at issue. The governing thesis of the majority opinion in *Montoya de Hernandez* is that the meaning and reach of the Fourth Amendment prohibition against "unreasonable searches and seizures" is determined by a balancing-of-interests test. Thus, the level-of-suspicion discussion opens as follows:

> The Fourth Amendment commands that searches and seizures be reasonable. What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself. The permissibility of a particular law enforcement practice is judged by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."

*Id.* 473 U.S. at 537, 105 S.Ct. at 3308 (citations omitted). This test dominates the Court's analysis and generates the result in *Montoya de Hernandez*.

The 'reasonable suspicion' standard has been applied in a number of contexts

and effects a needed balance between private and public interests when law enforcement officials must make a limited intrusion on less than probable cause. It thus fits well into the situations involving alimentary canal smuggling at the border: this type of smuggling gives no external signs and inspectors will rarely possess probable cause to arrest or search, yet governmental interests in stopping smuggling at the border are high indeed.

*Id.* at 541, 105 S.Ct. at 3310–3311.

■ In the instant case, this same balancing test yields an equally clear result: The severe detention of Mr. Onyema was by no means a "limited intrusion" under the Fourth Amendment. After undergoing a routine customs search, Mr. Onyema was stripped of his clothing and forced to wear what was, in effect, prison garb; he was chained like an animal to a hospital bed for more than three full days; he was forced to wash his feces; and he was denied, throughout, the privilege of placing even a single call either to family members or to an attorney. As far as the outside world was concerned, Onyema had disappeared. Indeed, even after he was formally placed under arrest, Mr. Onyema was held incommunicado and shackled to the metal bed for nearly sixty additional hours.

■ Moreover, there are no compelling governmental interests counterbalancing the private interests in this case that favor a judicial authorization requirement. The governmental interest justifying the detention of a suspect like Mr. Onyema is satisfied by the seizure of his body. The issue, once the suspect is firmly in custody, becomes not whether the suspect may be detained on less than probable cause, but rather who should decide whether the requisite showing has been made to justify his prolonged incommunicado detention under the circumstances present here. There is simply no good reason why the Customs Inspectors should not be required to present the evidence supporting the detention of the suspect to a neutral and detached magistrate.

This conclusion is bolstered by rulings in related areas of law. In *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Supreme Court evaluated the Fourth Amendment requirements applicable to the extended detention that followed an arrest without a warrant. The opinion, per Justice Powell, set forth a balancing analysis strikingly similar to the one just presented.

> Once the suspect is in custody, ... the reasons that justify dispensing with the magistrate's neutral judgment evaporate. There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest.... When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty.

*Id.* at 114, 95 S.Ct. at 863. On this basis, *Gerstein* held that the Reasonableness Clause of the Fourth Amendment requires law enforcement officials promptly to justify the detention of a suspect before a judicial officer when an arrest has been made without a warrant.

The precise meaning *Gerstein*'s requirement of a "prompt" judicial determination was recently fleshed out in the case of *County of Riverside v. McLaughlin*, —— U.S. ——, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). *McLaughlin* held as an initial matter that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id.* at ——, 111 S.Ct. at 1670. The Supreme Court, however, took pains to dispel any misconception that its ruling represented a general license for law officers to hold suspects for forty-eight hours without judicial authorization.

This is not to say the probable cause determination in a particular case passes constitutional muster simply because it is provided within 48 hours. Such a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. In evaluating whether the delay in a particular case is unreasonable, however, courts must allow for a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and other practical realities.

Where an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay. Rather, the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance.

*Id.* *McLaughlin*'s principal significance lies, accordingly, in its toleration of unauthorized detentions that endure for a certain length of time—up to 48 hours from the initial seizure—after which the burden of proof shifts from the suspect claiming unreasonable delay to the prosecutor defending the delay as reasonable.

Although the United States Attorney makes no attempt to excuse or explain either the initial nineteen hour delay or the subsequent fifty-nine hour delay after probable cause was established, he could arguably point to the difficulties in transporting a suspect to a hearing before a Magistrate while continuing to monitor the suspect's bowel movements. That practical consideration should, however, offer no bar to a proceeding that would determine the propriety of the suspect's continued detention after the initial seizure. Indeed, *Gerstein* expressly held that a full adversary proceeding was not required for a probable cause determination. *See* 420 U.S. at 119, 95 S.Ct. at 865. On the contrary, it found that the Fourth Amendment was satisfied by a "nonadversary" or "informal" proceeding based upon "hearsay and written testimony." *Id.* at 120–21, 95 S.Ct. at 866–67. This was precisely the type of proceeding provided to Mr. Odofin in *United States v. Odofin.* Mr. Odofin was present only through his attorney at the hearing that took place five days into his detention and that authorized his continued custody.[2]

Although *Gerstein* and *McLaughlin* involved judicial determinations of probable cause, the fact that probable cause is not required to justify a customs search and seizure does not preclude the necessity of a judicial authorization under the circumstances here. While the Warrant Clause provides that warrants may issue only on a showing of probable cause, it does not limit the capacity of the Reasonableness Clause to require some kind of judicial authorization to ensure that a search or seizure is reasonable where less than probable cause is required to justify the intrusion. Particularly apposite to this point are the cases decided by the Supreme Court involving custodial detention for the purpose of fingerprinting the detained suspects. The first of these cases was *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). *Davis* suggested that "such detention might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense," *id.* at 727, 89 S.Ct. at 1398, so long as it enjoyed the "authorization of a judicial officer." *Id.* at 728, 89 S.Ct. at 1398. The

---

**2.** While the adversary proceeding in *Odofin* was commenced by Odofin's attorney, a Magistrate would surely have discretion to appoint counsel when appropriate if, as is customary, the "reasonable suspicion" or "probable cause" proceeding was brought without the defendant being present.

Supreme Court, however, had "no occasion" to reach that issue, given the absolute failure of the police "to employ procedures which might comply with the requirements of the Fourth Amendment." *Id.*

This issue was taken up in the case of *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). *Hayes* examined again the constitutionality of a nonconsensual detention of a suspect at a police station for the sole purpose of obtaining his fingerprints. The Supreme Court, in an opinion by Justice White, ruled that "such seizures, *at least where not under judicial supervision,* are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause." *Id.* at 816, 105 S.Ct. at 1647 (emphasis added). The majority continued:

> We also do not abandon the suggestion in *Davis* and *Dunaway* [*v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)] that under circumscribed procedures, the Fourth amendment might permit the judiciary to authorize the seizure of a person on less than probable cause and his removal to the police station for the purpose of fingerprinting. We do not, of course, have such a cause before us.

*Id.* at 817, 105 S.Ct. at 1647. *See also Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 538–39, 87 S.Ct. 1727, 1735–36, 18 L.Ed.2d 930 (1967) (permitting the issuance of warrants for the routine inspection of a house in the absence of probable cause that the particular dwelling contained a code violation, relying instead on a "variable" probable cause standard, and concluding that "reasonableness is still the ultimate standard" for justifying a warrant).

*Gerstein, McLaughlin,* and the fingerprint cases suggest that extended detentions do, at a minimum, require an evaluation by a judicial officer of the evidence supporting the detention even though such authorizations may issue on less than probable cause to believe that a suspect has committed a crime. Their application to the present case is, moreover, fortified by the fact that the detention here at issue bears little resemblance to the "routine" border searches and detentions approved in *Ramsey, Carroll* and *Boyd* and that it was far more brutal than the detentions in *Montoya de Hernandez* and *Odofin.* The use of such extreme measures, combined with the fact that Mr. Onyema was held incommunicado for seventy-eight hours, mandates the conclusion that his detention crossed the boundary of the authority granted to Customs Inspectors to detain travelers without judicial authorization.

Moreover, it bears repetition, because of arguments suggesting otherwise offered both by the United States Attorney at oral argument and by the Court of Appeals in *Odofin, see* 929 F.2d at 60, that the issue here is not whether a suspect like Mr. Onyema may be detained until he moves his bowels. The issue is simply who decides that he will be subjected to a prolonged detention under conditions like those that Mr. Onyema was forced to endure.[3] As Justice Jackson observed in *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948):

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

*Id.* at 13–14, 68 S.Ct. at 369. It is simply inconceivable that a detention as profound-

---

**3.** The analysis set out above has assumed that the measures employed by the Customs Inspectors were otherwise reasonable and necessary. In fact, the circumstances of Mr. Onyema's custody raise grave doubts about the necessity and propriety of shackling him and holding him incommunicado. Indeed, the lengthy incommunicado detention effectively suspended for Mr. Onyema the "privilege of the Writ of Habeas Corpus," U.S. Const. art. I, § 9, by preventing him from seeking judicial review of the grounds upon which he was being held. Because, however, the issue was not pressed by defendant's counsel, it is not addressed here.

ly intrusive as that of Mr. Onyema would not require the authorization of a judicial officer, notwithstanding proof sufficient to support even probable cause. Such a requirement is all the more imperative because extended border detentions may be initiated on reasonable suspicion alone, a quantum of evidence more likely than the normal probable cause standard to result in mistaken detentions. *See Montoya de Hernandez*, 473 U.S. at 545, 105 S.Ct. at 3312 (Stevens, J, concurring); *cf. United States v. Holtz*, 479 F.2d 89, 94 (9th Cir.1973).

## CONCLUSION

■ Customs Inspectors may, without prior judicial authorization, take a traveler entering the United States into an initial custody when the traveler is reasonably suspected of carrying narcotics in his or her alimentary canal. Under basic Fourth Amendment principles, however, those officials must promptly bring the evidence supporting their reasonable suspicion before a judicial officer if that detention threatens to require the prolonged application of highly intrusive procedures, such as holding the suspect incommunicado and in chains for extended periods of time.[4] The Customs Inspectors, it bears mention, may use the hearing to request as well, or in the alternative, a judicial order permitting a nonconsensual x-ray or any other medical procedure that will swiftly resolve any doubts concerning the traveler's intentions and that may well obviate the need for a lengthy custody prior to arrest.

■ The detention here at issue was clearly of a character that required the evaluation of a judicial officer. It was not a close case. The Customs Inspectors who held Mr. Onyema in custody and in chains for nearly seventy-eight hours were plainly obligated to seek the authorization of a judicial officer, and they plainly failed to discharge this obligation. While the seizure of Mr. Onyema without judicial autho-

rization was reasonable at its inception, *see Montoya de Hernandez*, 473 U.S. at 541, 105 S.Ct. at 3310, it became unreasonable with the prolonged subjection of Mr. Onyema to the conditions previously described. *See United States v. Jacobsen*, 466 U.S. 109, 124, 104 S.Ct. 1652, 1662, 80 L.Ed.2d 85 (1984) ("[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes ... interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'"). Unlike *Odofin*, where the defendant passed his first balloons *after* judicial authorization had been obtained and, consequently, when he was lawfully in custody, *see Segura v. United States*, 468 U.S. 796, 813–15, 104 S.Ct. 3380, 3389–91, 82 L.Ed.2d 599 (1984); *Johnson v. Louisiana*, 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972), Mr. Onyema passed his first balloons some nineteen hours into his unauthorized detention. Because there was no exigency that prevented the Customs Inspectors from obtaining judicial authorization long before that point in the custody, the extended detention of Mr. Onyema, under the conditions to which he was subjected, constituted a violation of his rights under the Fourth Amendment, and the evidence acquired through that detention must be suppressed.

■ While the Court of Appeals suggested in *Odofin* that the application of the exclusionary rule was not appropriate because "the Customs inspectors had a good-faith belief that under the circumstances, they need not present the Odofin situation to a Magistrate during the first five days of detention," 929 F.2d at 60 n. 9, it is inconceivable that any properly trained law enforcement officer could harbor the belief that he could detain a suspect under the conditions present here for seventy-eight hours without some kind of judicial authorization.[5] Moreover, my own decision in

---

4. The United States District Courts have broad authority to issue appropriate orders at these hearings under the All Writs Act, 28 U.S.C.A. § 1651 (1966). *See, e.g., United States v. New York Telephone Co.*, 434 U.S. 159, 172–74. 98 S.Ct. 364, 372–73, 54 L.Ed.2d 376 (1977).

5. The Court of Appeals did not, in fact, indicate whether it regarded the "good-faith belief" of the Customs Inspectors to be relevant as a factor in determining the reasonableness of Mr. Odofin's detention or to be relevant only to the application of the exclusionary rule. The law is

*Odofin* placed the Customs Inspectors on notice that some form of judicial authorization was required for extended detentions, even in the absence of the extraordinary circumstances that characterized Mr. Onyema's custody. *See Odofin*, 929 F.2d at 59–60. Indeed, in response to my ruling in *Odofin*, the United States Attorney for the Eastern District of New York advised the Court of Appeals that he had directed the Customs Service to notify him "within twenty-four hours of detention if a suspected 'balloon swallower' has not defecated." Government's Brief in *Odofin* at 8 n. 5. Such a half-hearted measure, however, is inadequate to ensure that suspects are not held under the conditions found in the present case.

SO ORDERED.

clear, however, that such a belief would go only to the application of the exclusionary rule, *see United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and would not diminish the Fourth Amendment violation of an otherwise constitutionally "unreasonable" search or seizure. *See Beck v. Ohio,* 379 U.S. 89, 96–97, 85 S.Ct. 223, 228–229, 13 L.Ed.2d 142 (1964).