**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Christine Sieko MASTBERG,**
**Defendant-Appellant.**

**No. 73–2581.**

United States Court of Appeals,
Ninth Circuit.

Sept. 19, 1974.

Michael E. Withey, of Smith, Kaplan & Withey, Seattle, Wash., for defendant-appellant.

J. Ronald Sim, Asst. U. S. Atty., Seattle, Wash., for plaintiff-appellee.

Before BROWNING and WALLACE, Circuit Judges, and WILLIAMS,* District Judge

## OPINION

WALLACE, Circuit Judge:

Mastberg appeals her conviction of unlawful importation of heroin in violation of 21 U.S.C. §§ 952(a) and 960(b)(1), charging that evidence derived from a body-cavity search should have been suppressed. We affirm.

Mastberg and two male companions entered the United States from Canada approximately 3:00 a. m. at the Blaine, Washington, port of entry. Customs inspector Hassebrock saw open chocolate milk cartons in the vehicle and, upon questioning the occupants of the car, noticed that Mastberg and the driver were nervous and restless. Hassebrock requested the assistance of another inspector and asked the occupants to get out of the car. After observing needle marks on the arms of all three individuals, the inspectors escorted them to the customs building where they searched the trio's clothing. Hassebrock's search of Mastberg's purse revealed a plastic bag which contained some balloons. A strip search of the two males revealed nothing. A matron accompanied Mastberg to a search room and conducted a strip search. Mastberg removed her clothing and told the matron that she was wearing a tampon because she was menstruating. The matron testified that she saw a double or looped string protruding from Mastberg's vagina instead of one string which the matron said was normal for a tampon. After the matron asked Mastberg several times to remove

* Honorable Spencer Williams, United States District Judge, San Francisco, California, sitting by designation.

the tampon, she finally told her that if she did not remove it a medical doctor would be called to do so. Reluctantly admitting that she had something other than a tampon in her vagina, Mastberg removed a prophylactic with three balloons inside, each containing heroin.

Mastberg asserts that there were no objective, articulable facts to establish a real suspicion justifying a strip or skin search. In addition, she argues that the search was in fact a body-cavity search and that even if there was a real suspicion for a strip search, there was no clear indication that she was carrying contraband and thus the body-cavity search was illegal.

## I. THE STRIP SEARCH

■ The first phase of the matron's search was a strip or skin search. In order for the search to be valid, the government agent must have a real suspicion prior to the suspect's disrobing.

"Real suspicion" justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law.

The objective, articulable facts must bear some reasonable relationship to suspicion that something is concealed on the body of the person to be searched; otherwise, the scope of the search is not related to the justification for its initiation, as it must be to meet the reasonableness standard of the Fourth Amendment.

United States v. Guadalupe-Garza, 421 F.2d 876, 879 (9th Cir. 1970). The following objective, articulable facts are before us to establish "real suspicion" justifying the strip search:

1. Mastberg and the driver of the car appeared "nervous" and "restless."

2. The customs inspector observed open chocolate milk cartons in the car.

3. All three of the suspects had needle marks on their arms.

4. The inspector found balloons in Mastberg's purse.

5. The two male companions were strip-searched and no contraband was found.

Mastberg, citing three of our prior cases, United States v. Holtz, 479 F.2d 89 (9th Cir. 1973), United States v. Summerfield, 421 F.2d 684 (9th Cir. 1970), and United States v. Shields, 453 F.2d 1235 (9th Cir.), cert. denied, 406 U.S. 910 92 S.Ct. 1615, 31 L.Ed.2d 821 (1972) asserts that in each one there was some objective, unambiguous evidence of present drug possession. Comparing these cases to the facts of the instant case, Mastberg argues that there were not enough objective, articulable facts to support a real suspicion of her smuggling. Mastberg claims that the suspicious factors in the present case when compared with *Holtz* were minimal. In *Holtz*, two male companions crossed the border accompanied by Holtz. At the border crossing, an inspector noticed that the three were "unkempt, anxious and uneasy." 479 F.2d at 90. Another inspector noticed "that one of the men was very nervous and 'strung out' and that he kept blinking his eyes," that another man was "subdued" and that Holtz "also seemed nervous." *Id.* The car had New Mexico license plates yet the trio was crossing the border at Nogales, Arizona. The occupants had no luggage and had declared no purchases. One inspector thought he smelled marijuana, although none was found. A condom was found in Holtz' purse. As the search continued, one of the men became increasingly nervous. None of the three had any identification, but all gave a name and address. The Bureau of Customs' computer identified one of the men as a known associate of a heroin dealer in New Mexico. Fresh needle marks

were found on both the men but a strip search of them revealed no contraband. However, during the strip search, one of the two men became so sick he vomited. A strip search of Holtz revealed heroin and we upheld the search.

In *Shields*, we stated:

> Appellant's nervousness (reflected in an uncomfortable, rigid posture, high-pitched and strained voice, avoidance of the inspector's eyes, and exaggerated emphasis upon the plaster of Paris souvenirs purchased across the border); the needle marks upon her arms, including one or two that were "seeping," and hence only one to four hours old; similar marks upon her companion's arms; and the shortness of their visit (one to one-and-a-half hours) were "objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect" that she was concealing contraband on her body.

453 F.2d at 1236. And in *Summerfield*, we said:

> We consider that the customs authorities in this case had a "real suspicion" sufficient to order appellant to strip. They testified that appellant appeared nervous and his eyes were pinpointed not unlike those of one under the influence of narcotics. He had a number of fresh needle marks on both arms. A search of his wallet revealed three rolled-up cotton balls of the kind frequently employed by narcotics users.

421 F.2d at 685.

We accept Mastberg's argument that in *Holtz* and *Shields* the facts were stronger support for real suspicion of smuggling than the facts of this case. We do not necessarily agree, however, that the facts in *Summerfield* are any stronger than those presented here. In addition, there are other cases from our own circuit in which the facts, as compared to those in this case, were no stronger yet no weaker. For example, in United States v. Gil de Avila, 468 F.2d 184 (9th Cir. 1972) the only facts supporting a real suspicion were that the occupants of the car were extremely nervous, that they had brought nothing from Mexico other than a loaf of bread and that one of the four occupants (although not the defendant-appellant) had needle marks on both arms. We upheld the strip search.

Even if we were to concede that the facts in this case were weaker than the facts in our prior cases, Mastberg's point would not be well taken. Comparing a case before us with our other cases may, at times, be helpful. But we are not concerned with whether the government had a better case in *Holtz* or *Shields* than in this case; the question is whether, on these facts alone, the search was reasonable under the real suspicion test.

Nevertheless, case comparison is helpful in determining what is important when the test is applied. In analyzing our border search cases, we find that certain factors have been instrumental in establishing a real suspicion of smuggling. Also, certain factors tend to bear a more direct relationship to suspicion of smuggling than others. Some of these factors are present in this case. For example, a person's nervousness while crossing the border is frequently a fact taken into account in determining whether to conduct a strip or body-cavity search. *Holtz, supra,* 479 F.2d at 90; United States v. Sosa, 469 F.2d 271, 272 n.1, 273 (9th Cir. 1972); United States v. Velasquez, 469 F.2d 264, 265 (9th Cir. 1972); United States v. Gil de Avila, 468 F.2d 184, 185 (9th Cir. 1972); *Shields, supra,* 453 F.2d at 1236; *Summerfield, supra,* 421 F.2d at 685; Rivas v. United States, 368 F.2d 703, 710 (9th Cir. 1966), cert. denied, 386 U.S. 945 87 S.Ct. 980, 17 L.Ed.2d 875 (1967). Similarly, needle marks on the person's arms are frequently a factor. *Holtz, supra,* 479 F.2d at 91; *Sosa, supra,* 469 F.2d at 272; *Velasquez, supra,* 469 F.2d at 265; *Shields, supra,* 453 F.2d at 1236; *Summerfield, supra,* 421 F.2d at 685; *Rivas, supra,* 368 F.2d at 710. Both of these elements were present in this case.

In addition, there were the open milk cartons and the balloons. A customs inspector testified that addicts often carry liquids with them and frequently conceal contraband drugs in body cavities by using balloons.[1]

Obviously, some of the factors in the present case are more important than others in determining whether a real suspicion of smuggling was established. If we were to consider each of the factors separately, the needle marks would be the most likely indication of smuggling and the element to which we lend greater weight. In degree of relative importance, nervousness would rank next. Neither the needle marks nor the nervousness can be considered totally innocuous. However, the milk containers[2] and balloons[3] each considered separately could be totally innocuous and are the least likely indication of smuggling. Many persons crossing the border probably carry balloons or open liquid containers and yet do not arouse a suspicion of smuggling. The open liquid containers and the balloons, even when considered together, could be totally innocuous. However, we do not view each of these separately to determine the reasonableness of the search. We must consider the totality of the factors, viewing them in the light of an experienced customs inspector, when determining the legality of the strip search.

Considering the evidence in this light, we view the facts as follows. The trio crossed the border at 3:00 a. m. Their nervousness aroused some suspicion. The open liquid containers coupled with the knowledge that addicts frequently carry liquids with them aroused further suspicion. The needle marks indicated that the travelers were possible addicts and certainly heightened suspicion. The balloons, coupled with the knowledge that they are frequently used to smuggle contraband in body cavities, added to the suspicions. The two male suspects were strip-searched first. The results were negative. When the strip search of Mastberg's companions revealed nothing, suspicion on Mastberg was heightened.[4]

While any single objective, articulable fact in this case might not support the conclusion of attempted smuggling, the test is whether all the facts viewed as a whole by an experienced customs inspector would lead to the necessary satisfaction of the real suspicion test. The district court found real suspicion existed. Mastberg has not met her burden of demonstrating that the trial court was wrong.

## II. NERVOUSNESS AS EVIDENCE

Mastberg argues that the district court erred by receiving and relying upon "nervousness" as an articulable fact because the only evidence of ner-

---

1. We view the testimony about the milk cartons as an indication of the type of paraphernalia sometimes carried by addicts. On this point, we note similar testimony in *Summerfield* where inspectors found three cotton balls of the kind frequently employed by narcotics users. The inspectors testified that addicts frequently carry similar cotton balls. 421 F.2d at 685.

2. The single factor of the milk cartons is not a likely indication of smuggling. As Mastberg points out, many travelers or vacationers in the countries surrounding our border are likely "to carry some form of consumable liquid, e. g., coffee, soda pop, or containers for such liquids" and "the presence of such articles cannot reasonably be regarded as suspicious."

3. Mastberg argues that the balloons "are entirely innocent in themselves and are a great

deal more indicative of an innocent use than of smuggling. Certainly if appellant had had a child with her on crossing the border, the inspector would not have given these balloons or the milk cartons a second thought." Children in the car might allay any suspicious character of the balloons. However, there were no children in the car when Mastberg crossed the border.

4. In *Holtz*, we held:
[F]acts derived from "the companions of the subject of the strip search can be considered in determining when such a search may be justified." United States v. Gil de Avila, 468 F.2d 184, 186 (9th Cir. 1972). *See* United States v. Shields, 453 F.2d 1235, 1236 (9th Cir.), cert. denied, 406 U.S. 910, 92 S.Ct. 1615, 31 L.Ed.2d 821 (1972).
479 F.2d at 91.

vousness was the opinion testimony of a witness. After one of the customs inspectors testified on direct examination that Mastberg was "nervous," her counsel sought to attack that testimony:

Q. But you didn't write anything down there as to what facts indicated nervousness?

A. I remarked "extreme nervousness". [On the search report]

Q. Wouldn't you feel that is your subjective evaluation of her based on your experience?

A. Yes, it is.

Q. There aren't any objective facts you can point to at this time which would indicate this nervousness? I'm referring to such things as shying eyes away, fiddling with her hands, anything like that, is that a fair statement?

A. No, I couldn't at this time single out any one specific item when I say nervousness.

Mastberg argues that the inspector's testimony on nervousness did not contain any objective facts and therefore it cannot support real suspicion. We disagree.

■ Testimony about corporeal appearances such as nervousness and drunkenness have produced considerable controversy. While the older view might preclude witnesses from giving their "opinion" on whether a particular person appeared nervous or intoxicated, under the modern, and probably majority, view a lay witness may state his opinion that a person appeared nervous or intoxicated. *E. g.,* People v. Smith, 94 Cal.App.2d Supp. 975, 210 P.2d 98 (1949) (intoxication); People v. Hernandez, 70 Cal.App.2d 190, 60 P.2d 564 (1945) (intoxication). *See* 32 C.J.S. Evidence § 546 (38) (1964).[5]

■ We hold that the procedure followed at the suppression hearing was correct. The inspector testified that Mastberg appeared nervous and counsel on cross-examination sought to attack that testimony by asking about the underlying facts. The inspector testified that he could not pinpoint the specific fact which led him to believe that Mastberg was nervous. He did not write down the facts on the search report. He only wrote on the search report that she appeared nervous. His testimony on nervousness was admissible. The trier of fact must weigh the accuracy of the testimony of the customs inspector and judge its credibility. Here, the trier of fact presumably resolved the factual issue in favor of the government. None of the trio testified and disputed the accuracy of the inspector's testimony. We cannot say that the trier of fact should have disregarded the testimony of nervousness.

## III. THE INSPECTORS NEED NOT RELATE THE BASIS FOR THEIR SUSPICIONS TO THE MATRON

■ The matron admitted that the other inspectors did not tell her about the circumstances which they thought justified the strip search of Mastberg. Therefore, Mastberg contends the search is invalid because the person searching did not possess all of the articulable facts justifying the intrusion. The testimony of the matron demonstrates that she knew that the inspectors believed they had evidence that

5. In the section in Wigmore's treatise on evidence which discusses corporeal appearances of persons such as intoxication, it is asserted:
 The Opinion rule is often sought to be applied to forbid compendious descriptions of the *appearances externally indicating internal states,*—for example, whether a person "looked" sick or sad or angry. There is no more reason in this class of cases than in the preceding one for the Opinion rule to exclude the testimony. The exclusionary rulings here abound particularly in absurdities and quibbles,—highly fit for cynical amusement, were not the names of Justice and Truth involved in their consideration. One may wonder how long these solemn farces will be perpetrated in our law.
 7 J. Wigmore, Evidence § 1974 (3d ed. 1940) (footnote omitted).

Mastberg was attempting to smuggle something, otherwise they would not have called upon her to conduct a strip search. It would be an absurdity and a miscarriage of justice for us to reverse this case simply because the inspectors did not communicate to the matron what they considered to be objective, articulable facts to justify a strip search. To require the inspectors to convey the basis of their suspicion to the matron would only be a meaningless gesture which could serve no useful purpose for either law enforcement or protection of an individual's personal rights. In United States v. Velasquez, 469 F.2d 264, 266 (9th Cir. 1972), we rejected the argument that customs inspectors must convey their knowledge of the facts to a physician before he can conduct a rectal probe. The same principle applies here.

## IV. THE BODY–CAVITY SEARCH

 Finding a justification for the strip search, however, only begins our inquiry. Mastberg contends that before the contraband was seized, a body-cavity search had occurred and the clear indication test must be met. We agree.

In Rivas v. United States, 368 F.2d 703, 710 (9th Cir. 1966), cert. denied, 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967), we described a body-cavity search as "a search involving an intrusion beyond the body's surface . . . ." In Henderson v. United States, 390 F.2d 805, 808 (9th Cir. 1967), we said that "if in the course of the search of a woman there is to be a requirement that she manually open her vagina for visual inspection to see if she has something concealed there, we think that we should require more than a mere suspicion." And in Morales v. United States, 406 F.2d 1298, 1299–1300 (9th Cir. · 1969), we held "that when the cavity to be searched is a vagina" a clear indication must exist. Although the matron did not search Mastberg's vagina, she told Mastberg that if she did not remove the tampon herself, a doctor would be called

to do so. Although the district court made no specific finding on consent, it is abundantly clear from the record that Mastberg's removal of the object was not by consent and was a "search." Since this was "a search involving an intrusion beyond the body's surface," and, the cavity to be searched was the vagina, we hold that the clear indication standard must be applied.

 During the course of the strip search, the matron observed that Mastberg was nervous and that she had needle marks on her arms. She also observed a double string protruding from Mastberg's vagina, indicating that an object was concealed therein. Since the string was plainly visible during the strip search, it could properly be considered by the matron in applying the clear indication test. *Holtz, supra,* 479 F.2d at 93 & n.3. Though Mastberg claimed to have only a tampon in her vagina, the matron had good reason to disbelieve this claim since, in her experience, only one string was normally attached to a tampon.

We hold that the above facts provide a clear indication of smuggling.

## V. REQUIREMENT OF WARRANT

 Mastberg has made a very lengthy and detailed argument contending that the Fourth Amendment's mandate of reasonableness dictates that border searches of the person be performed only after a warrant has been obtained. We reject this contention. United States v. Mason, 480 F.2d 563 (9th Cir.), cert. denied, 414 U.S. 941, 94 S.Ct. 246, 38 L.Ed.2d 167 (1973). She also argues that the Supreme Court's decision in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), requires us to reevaluate warrantless border searches and issue guidelines for and require a warrant for such border searches of the person. We fail to see how either the Fourth Amendment or *Almeida-Sanchez* requires the procedure for which Mastberg argues.

Affirmed.