GREGORY, Circuit Judge,
dissenting:
The majority is absolutely right, “[a] jury’s verdict commands the respect of an appellate court.” Ante 270. In fact, jury trials are “fundamental to the American scheme of justice.” Duncan v. State of La., 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). When the Government, therefore, infuses a case with impermissible evidence in order to attain a favorable jury verdict, not only does the Government undermine the province of the jury, it also destabilizes the entire justice system. In an effort to convict Mr. Baral-oto of knowingly transporting and conspiring to transport stolen goods, the Government played on prevalent misperceptions of “urban” America, piling inference upon inference in order to “prove” both that the goods Baraloto was dealing were stolen and that Baraloto had actual knowledge of this fact. The Government unabashedly relied on conjecture to meet its constitutional burden of proof. I must dissent.
I.
To convict Baraloto of transporting, and conspiring to transport stolen goods, the *273 Government had to prove beyond a reasonable doubt that: (1) the goods were stolen; (2) Baraloto transported the goods or caused them to be transported; (3) at the time of transportation, Baraloto knew the goods were stolen; and (4) the value of the stolen property was $5000 or more. The Government went about proving the first and third elements in large part by eliciting testimony from Fast Money’s owners, employees, associates, and clientele, all of whom opined in some regard that Fast Money’s customer base consisted of drug addicts who were necessarily dealing in stolen goods. Ante 265-68. Baraloto objected to this testimony, “maintain[ing] that the lay witnesses’ testimony that Fast Money dealt in stolen goods was not based on personal knowledge.” Ante 270. At least seven Government witnesses — Jerald Bradford, Scott Bradford, Ashley Williams, Warren Culver, Daniel Mimer, Michael Ender, and Jerome Stal — testified to the effect it was their belief that drug addicts stole goods to sell at Fast Money (and other neighborhood pawn shops). Baraloto argued this testimony violated Federal Rules of Evidence 602 and 701. Baraloto was right.
II.
Federal Rule of Evidence 602 declares “[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.” (Emphasis added). The only testimony excepted from the personal knowledge requirement is expert testimony. The majority does not contend the disputed testimony falls under the expert testimony exception. Instead, it concludes that the disputed testimony was admissible as lay witness opinion testimony under Federal Rule of Evidence 701. Opinion testimony allowed under Rule 701 is limited to testimony that is: “(a) rationally based on the witness’s perception; (b) helpful to clearly understand[ ] the witness’s testimony or to determine] a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.” Fed.R.Evid. 701. In hope that the same evidentiary errors are not repeated going forward, I provide a more comprehensive analysis of what Rule 701 permits generally, and then hone in on Rule 701’s application to the facts of this case.
A.
We have said in the past that Rule 701 “allows testimony based on the person’s reasoning and opinions about witnessed events, such as are familiar in every day life.” United States v. Offill, 666 F.3d 168, 177 (4th Cir.2011). Beyond this amorphous statement, our guidance has been scant. It is important to note, however, that nothing in Rule 701 exempts lay opinion testimony from the personal knowledge requirement found in Rule 602. Quite contrary, “[t]he requirement that lay opinion be based on the perception of the witness imports into Rule 701 the personal knowledge standard of Rule 602.” United States v. Mendiola, 707 F.3d 735, 741 (7th Cir.2013) (citing United States v. Bush, 405 F.3d 909, 916, n. 2 (10th Cir.2005)).
While there may be some ambiguity as to what comprises a “rationally based opinion,” at a minimum, Rule 701 lay opinion testimony requires a proper foundation to be laid, demonstrating the witness has “personal knowledge of the facts from which the opinion is derived.” U.S. v. Carlock, 806 F.2d 535, 551 (5th Cir.1986). The burden is on the party wishing to introduce lay opinion testimony, i.e., the Government, to establish this foundation. U.S. v. Grinage, 390 F.3d 746, 749 (2d Cir.2004). In laying a proper foundation, *274 “[t]he nature and extent of the contacts and observations” are important. United States v. Pickett, 470 F.2d 1255, 1258 (D.C.Cir.1972) (emphasis added). Therefore, in order for a court to admit lay-opinion testimony, it “must find that the witness’ testimony is based upon his or her personal observation and recollection of concrete facts.” United States v. Jackson, 688 F.2d 1121, 1124 (7th Cir.1982) (emphasis added) (citing United States v. Sheet, 665 F.2d 983, 985 (9th Cir.1982)). If the witness does not provide a proper basis for his opinion, then the testimony is not admissible under Rule 701. See United States v. Rea, 958 F.2d 1206, 1216 (2d Cir.1992).
Once a proper foundation for opinion testimony is laid, the Government must establish a rational connection between the “opinion and the observed factual basis from which it is derived.” Carlock, 806 F.2d at 551. This connection, or “reasonable inference” as some courts call it, must be one “that a normal person might draw from those observations.” Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 264 (5th Cir.1980). However, where a lay opinion is formed outside the realm of “common experience,” United States v. Paiva, 892 F.2d 148, 157 (1st Cir.1989) — where the average person could not form the same opinion based on the observed concrete facts, more is required to establish an adequate connection. In these instances, witnesses must explain their specialized experience with the subject of their lay opinion testimony. See, e.g., United States v. Williams, 212 F.3d 1305, 1310 (D.C.Cir.2000) (district court erred in allowing officer who lacked sufficient experience to testify it is common for drug users to carry weapons). “Though particular educational training is of course not necessary, the court should require the proponent of the testimony to show some connection between the special knowledge or experience of the witness, however acquired, and the witness’s opinion regarding the disputed factual issues in the case.” Asplundh Mfg. Div. v. Benton Harbor Eng’g, 57 F.3d 1190, 1202 (3d Cir.1995).
At bottom, if lay opinion testimony is not adequately scrutinized before it is admitted, it runs the risk of implanting into a juror’s mind the conclusion that he or she is to draw from the facts presented. See United States v. Sanabria, 645 F.3d 505, 515 (1st Cir.2011). It is for this reason that lay opinion testimony will “probably be more helpful when the inference of knowledge is to be drawn not from observed events or communications that can be adequately described to the jury....” Rea, 958 F.2d at 1216 (emphasis added) (citing United States v. Fowler, 932 F.2d 306, 312 (4th Cir.1991)). Thus, lay opinion testimony should be used only in the instances where the “witness cannot adequately communicate to the jury the facts upon which his or her opinion is based,” Jackson, 688 F.2d at 1124 (citing Skeet, 665 F.2d at 985), as “Rule 701 simply recognizes lay opinion as an acceptable ‘shorthand’ for the ‘rendition of facts that the witness personally perceived.’ ” United States v. Garcia, 413 F.3d 201, 211 (2d Cir.2005) (citing 4 Weinstein’s Federal Evidence § 701.03[1]); see also Fed.R.Evid. 701 advisory comm, note (Rule 701 “retains the traditional objective of putting the trier of fact in possession of an accurate reproduction of the event”).
B.
An adequate foundation of personal knowledge is especially important when it comes to providing lay opinion testimony about drug use and addiction. The average person may have little or no experience with drugs, and therefore this testimony falls out of the realm of “common *275 experience.” Paiva, 892 F.2d at 157. An adequate foundation necessary for drug opinion testimony may include a witness’s “prior use and knowledge of [a] drug and his sampling of the substance which he identified, coupled with his statement that the drug [he testified about] affected him in the same manner as the drug he had previously ingested.” United States v. Sweeney, 688 F.2d 1131, 1145 (7th Cir.1982). Or, a witness may give his lay opinion that a particular substance is a certain drug, “so long as a foundation of familiarity with the substance is established.” United States v. Durham, 464 F.3d 976, 982 (9th Cir.2006). For example, the Eighth Circuit held the lay opinion of a witness who identified a substance she consumed as amphetamine was inadmissible because she had no experience with the drug; however, the lay opinion of two other witnesses who had previously used amphetamine was admissible. United States v. Westbrook, 896 F.2d 330, 336 (8th Cir.1990).
To give another example of valid lay opinion testimony, a lay witness may opine under Rule 701 that a person is under the influence of alcohol — this is within the realm of “common experience.” See United States v. Mastberg, 503 F.2d 465, 470 (9th Cir.1974) (allowing testimony that person appeared under the influence of alcohol); see also Asplundh Mfg. Div., 57 F.3d at 1196 (same). Conversely, lay witnesses are “not sufficiently knowledgeable about common symptoms of drug consumption,” and therefore cannot testify that a person was under the influence of drugs without providing a foundation for the basis of their knowledge. State v. Nobach, 309 Mont. 342, 46 P.3d 618, 622 (2001) (with a lay opinion testimony rule that directly tracks the language of Rule 701); cf. Sanders v. United States, 373 U.S. 1, 20, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) (“Whether or not petitioner [testifying at trial] was under the influence of narcotics would not necessarily have been apparent to the trial judge.”).
In line with general evidentiary principles, the amount of prior experience that is sufficient for an adequate foundation should be left to the discretion of the trial judge. Harris v. Dist. of Columbia, 601 A.2d 21, 24 n. 3 (D.C.1991). However, the bottom line is that a witness must establish some prior experience for the testimony to be admissible under Rule 701; con-clusory statements are not adequate. See Pedraza v. Jones, 71 F.3d 194, 197 (5th Cir.1995); Kurina v. Thieret, 853 F.2d 1409 (7th Cir.1988). But see United States v. Spriggs, 996 F.2d 320, 325 (D.C.Cir.1993) (detective’s opinion about effects of drug use was admissible because of his experience with drug addicts).
III.
Now that the contours of Rule 701 generally and in relation to drug testimony are adequately explained, I turn to the testimony in this case. I am mindful that we review a district court’s evidentiary rulings for abuse of discretion. Ante 269-70 (citing United States v. Perkins, 470 F.3d 150, 155 (4th Cir.2006)). This deferential standard of review does not require us, however, to kowtow to a district court’s reasoning behind its evidentiary rulings when the rulings rest on an erroneous application of the law, as it is clear that “[a]n error of law is, by definition, an abuse of discretion.” United States v. Basham, 561 F.3d 302, 325-26 (4th Cir.2009) (internal citations omitted). As shown below, the lay opinion testimony objected to by Baraloto fails to meet the requirements of Rule 701. Thus, the testimony is insufficient as a matter of law, and as such, the district court abused its discretion by admitting it.
*276 A.
Only one witness, Amanda Boothe, testified personally to her drug use and to the fact that she sold stolen goods at Fast Money.* The testimony of the witnesses detailed below, however, expands beyond personal knowledge, requiring a number of logical leaps outside the realm of common experience. And because the Government did not, and probably could not, lay adequate foundation for this unrepressed testimony, it does not meet the requirements of Rule 701.
1.
First, the vague testimony regarding the number of drug addicts at Fast Money is inadmissible. One employee of Fast Money made no mention of customers having physical signs of drug use, while others said that almost every customer that walked through Fast Money’s doors had physical markings indicating drug use. For instance, Jerald Bradford, owner of Fast Money, surmised that 90% of Fast Money’s clientele were drug addicts. J.A. 878. He said he could tell “usually from IV, the needle marks on their arms, skin pops, stuff like that.” Id. Using similar reasoning, his brother, Scott Bradford, testified Fast Money clients were drug abusers because “[s]ome of them had obvious marks on their body, arms, and some were actually bending over, they call it nodding out, to where they can’t even stand up.” J.A. 994. And Ashley Williams, Jerald Bradford’s step-daughter who worked at Fast Money, also said that she knew 90% of Fast Money’s customers were drug addicts because “[t]hey just have the look of sores on them.” J.A. 1055. On the other hand, another Fast Money employee, Michael Ender, testified that the “[pjeople were on drugs and needfed] money,” J.A. 1087, but never testified to witnessing any signs of drug use or addiction and did not testify to knowing any of the customers personally.
Leaving the inconsistencies in the testimony aside, there was no foundation laid by any of the witnesses allowing them to testify as to a group of customers’ drug addiction. None of the witnesses testified to having special knowledge of any drugs of any kind. There was nothing adduced at trial to explain how these witnesses knew what was consistent behavior with that of a drug addict, nor how they knew what physical signs were consistent with drug use. No specifics were given regarding who was using drugs. And not one drug addict that sold OTC/HBAs (other than Boothe) was identified with any certainty. There is no indication that any of the Fast Money witnesses interacted with these drug addicted customers on a regular basis, and in fact, there is testimony to the contrary. See, e.g., J.A. 1054 (Testimony of Ashley Williams) (testifying she interacted with customers “every once in a while”). This testimony lacks the adequate foundation necessary for Rule 701 lay opinion testimony regarding drug use.
The witnesses should have been allowed to testify as to what they personally observed, that is permissible under Rule 701. They should have been prohibited, however, from drawing a conclusion that these physical signs they witnessed were evidence of drug addiction without providing a concrete explanation as to how they knew these observations were indicators of drug use or addiction. See United States v. Noel, 581 F.3d 490, 496 (7th Cir.2009) (“[A] lay witness’s purpose is to inform the *277 jury what is in the evidence, not to tell it what inferences to draw from that evidence.”)- To allow witnesses to make sprawling affirmations categorizing Fast Money’s client base as drug addicts with no specifics to support this testimony violates Rule 701. These vast generalizations are not based on sufficient personal knowledge.
2.
Even assuming the opinion testimony regarding Fast Money’s clientele’s overwhelming rate of drug addiction was permissible under Rule 701, this was not the only inference at play in this case. If one impermissible inference was not enough, the witnesses then had to conclude that the drug addicts necessarily transacted in stolen goods to support their drug habit. This additional layer of inference goes beyond the bounds of permissible extrapolation based on first-hand perception and into the realm of pure speculation.
Multiple witnesses testified openly to their stereotypical belief that all drug addicts were desperate for money and therefore had to steal to support their habit. See, e.g., J.A. 941 (Testimony of Jerald Bradford) (when asked if he thinks people on drugs steal, he responded “[y]ou can say I am a skeptic”); J.A. 1098 (Testimony of Michael Ender) (“People that were on drugs and need money, so they were out doing what they had to do [i.e., steal]”); J.A. 1121 (Testimony of Daniel Mimer) (calling customers “drug addicts, people who needed cash for, you know, control their habits”); J.A. 1325, 1428 (Testimony of Jerome Stal) (calling customers “crackheads” who were “in need of money”). This testimony has nothing to do with the witnesses’ personal observations, a fundamental requirement of Rule 701.
The inferences drawn in this case were hardly reasonable — I was unaware that the only way drug addicts could support their drug habit was to steal, in bulk, “thousands of dollars” of over-the-counter health beauty aids (an amazing feat in itself), and turn around and sell the stolen goods for “pennies on the dollar” at Fast Money pawn shop. Ante 271. Drug addicts do not solely reside in “high crime” neighborhoods as the one here, allowing for such stark generalizations. Drug addiction is an unfortunate affliction affecting every segment of society. See, e.g., John Byrne, New High Finance: Wall Street Drug Use Soars, N.Y. Post, Mar. 17, 2013, http://www.nypost.eom/p/news/business/ new_high_finance_gF1594vGbhIliOFYSli CBL. It surely cannot be that all drug users steal, given that drug users come in all hues and creeds. Drug addiction is not a uniform affliction with a certain set of character traits pre-attached. Yet the Government lumped together Fast Money’s customers, and through the inadmissible lay opinion testimony painted with a broad-brush what these (alleged) drug addicted customers likely can or cannot do.
Outside of pure speculation, the only evidence provided as the basis for the witnesses’ opinion that the goods sold at Fast Money were stolen was the fact that the goods still had stickers on them, see J.A. 1056 (Testimony of Ashley Williams), and that the items were sold at low prices, see J.A. 1179-80 (Testimony of Warren Cul-ver). This evidence is just as consistent, however, with the “entirely innocuous” aspects of a secondary OTC/HBA market. United States v. Ebert, No. 96-4871, 1999 WL 261590, at *13, *22 (4th Cir.1999) (unpublished). As such, they cannot be the basis for personal knowledge that the goods were stolen.
The Government, in large part, went about proving that Fast Money dealt in stolen goods by allowing witnesses to opine that drug addicts in this neighborhood *278 were poor and desperate, and therefore had to steal as a condition subsequent. I balk at the notion that a witness could testify as a matter of personal knowledge that goods were stolen solely because of a person’s perceived economic circumstance and supposed drug addiction. This testimony not only fails to satisfy Rule 701, in my opinion, it also allows “the very stereotype the law condemns.” Powers v. Ohio, 499 U.S. 400, 410, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).
3.
And if it was not clear that the Government was relying on conjecture and stereotype to prove its case, it then introduced similar testimony from three witnesses who testified that stolen goods were sold by drug addicts at other area pawn shops. Not only did their testimony suffer the same fatal flaws as the testimony above, even more troubling is the lack of relevance of the testimony as to whether Fast Money’s goods were stolen and Baraloto’s knowledge of this fact.
Warren Culver was allowed to testify, over Baraloto’s objection, that the goods sold at TS Liquidators (a neighborhood pawn shop), were stolen because “there’s no other way you could possibly get that stuff to sell that cheap.” J.A. 1179-80. Likewise, Daniel Mimer never testified to going to Fast Money, but did work at another neighborhood pawn shop, “We Buy,” and was permitted to give his opinion that We Buy’s clientele were “basically drug addicts, people who needed cash for, you know, control their habits, basically.” J.A. 1121. Mimer never saw Baraloto at We Buy. Finally, Jerome Stal, who worked at “EZ Money” — another pawn shop in the area, gave opinion testimony characterizing the goods sold at EZ Money as stolen. The Government had Stal read into the record the following sign displayed at EZ Money as notice for its employees:
This goes for everyone here. Regardless of what some of our customers may decide to do with their time and money when they [visit] this store, we have no right to criticize them for their decisions. The next employee that calls a customer a junkie, drug addict, dope fiend, et cetera, will no longer have a job. Remember, these people make sure that we have money at the end of the week.
J.A. 1319. And when asked by the Government if EZ Money’s customers were the type to engage in couponing or any other legitimate means of transacting in the OTC/HBA secondary market, Stal said no, “The people that I saw ... didn’t seem the type of person that they’re disciplined to go do this for hours and hours and come into a pawn shop and sell it to the pawn shop.” J.A. 1396. This testimony was not only flawed under Rule 701, but it was irrelevant and prejudicial under Rules 401 and 403. The testimony was inadmissible.
In short, the conclusions of at least seven Government witnesses relied on multiple inferences centered on stereotypical portrayals of urban blight. The testimony was not based on the witnesses’ first-hand perception and did not have an adequate foundation as required by Rule 701. Nor was much of the testimony relevant to what the Government was required to prove in this case. The admission of this line of testimony runs afoul of the Federal Rules of Evidence, and as such, the district court erred as a matter of law by allowing this testimony into evidence.
B.
The story woven throughout the lay opinion testimony is clear. Fast Money is located in a dangerous, drug-ridden Baltimore neighborhood. See ante 265 (Fast *279 Money was in a “[v]ery rough [neighborhood], [with] a lot of drugs, [and] homicides”). Given this community, it is no surprise that most, if not all, of Fast Money’s customers were not only drug users, but drug addicts. See ante 265-66. (“[A]bout 90% of [Fast Money’s] clientele was comprised of drug addicts”). And because the drug addicts in this rough neighborhood are not only poor, but exceedingly unruly, there is no legitimate means by which Fast Money’s clientele could partake in the secondary OTC/HBA market. See ante 267-68 (Fast Money’s clientele consisted “typically, of drug addicts who needed money for drugs”); Appellee’s Br. 51 (who did not have “the capital or the discipline to engage in organized couponing”). As such, anyone with a pair of eyes and functioning brain knew Fast Money was transacting in stolen goods.
Based on this simplistic stereotype-based narrative, “any reasonable observer could conclude, as a matter of common sense, that the goods were stolen.” Ante 271. And from here, a juror could conclude, as a matter of “common sense,” that Baraloto knew the goods were stolen. But taking a step back, these so-called “common sense” conclusions required the witnesses to make a number of logical leaps to form their opinions, skirting around the personal knowledge requirement found in the Federal Rules of Evidence. These “common sense” conclusions amount to nothing more than speculation and stereotype based on socioeconomic status, geographic location, and personal appearance. This line of reasoning is dangerous — I do not see what would stop the Government from indicting and convicting any person who conducted business at Fast Money or a similar neighborhood pawn shop. It is for this reason that allowing a witness to base his or her opinion on “common sense” is speculation not grounded on personal observations. See United States v. Whitworth, 856 F.2d 1268, 1284-85 (9th Cir.1988). Admitting this testimony regarding both customer addiction and their belief that customers were selling stolen goods fails to satisfy the requirements of Rule 701.
C.
As a matter of principle, I find it extremely objectionable what the Government did here. The poverty and appearance of Fast Money’s customers was not probative, let alone dispositive, in determining the key question at hand — whether the goods sold at Fast Money were stolen; and it is wholly irrelevant to whether Bar-aloto knew the goods were stolen. But still the Government relied on this testimony, most probably because “[t]he impact of narcotics addiction evidence upon a jury of laymen is catastrophic ... the public ... has been taught to loathe those who have anything to do with illegal narcotics.” Washington v. LeFever, 102 Wash.2d 777, 690 P.2d 574, 577 (1984) (en banc). And apparently goaded by the district judge’s assertion that the Government is “entitled to introduce evidence of any tendency to prove that the goods were stolen,” ante 267, the Government presented a case bereft of evidence that would actually tend to prove the goods sold at Fast Money were stolen. There were no reports of neighborhood OTC/HBA crime waves. Store logs were not reproduced evincing OTC/ HBAs were stolen and subsequently sold at Fast Money. Evidence such as this may have been helpful to the jury in deciding whether Fast Money dealt in stolen goods. Instead, the Government’s case hinged on “factors ... wholly unrelated to the blameworthiness of [Baraloto].” Booth v. Maryland, 482 U.S. 496, 504, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). While the Government may have been “entitled,” or more accurately, required, to prove its *280 case, this “entitlement” is necessarily limited by the Federal Rules of Evidence, which the Government did not adhere to.
IV.
With the errors finally revealed, Baralo-to still must overcome harmless error review, because “we will not reverse if we can say ‘with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.’ ” Ante 270 (quoting United States v. Brooks, 111 F.3d 365, 371 (4th Cir.1997)). There is no doubt in my mind that the repeated evidentiary errors “substantially swayed” the jury’s verdict, warranting a new trial under the cumulative error doctrine. See United States v. Lighty, 616 F.3d 321, 371 (4th Cir.2010).
We have previously noted that “[i]f more than one error occurred at trial, then all errors are aggregated to determine whether their cumulative effect mandates reversal.” United States v. Montague, 202 F.3d 261 (4th Cir.2000) (unpublished table decision); see also United States v. Basham, 561 F.3d 302, 330 (4th Cir.2009) (explaining the cumulative error doctrine). This aggregation is necessary because “[a] column of errors may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts.” United States v. Sampson, 486 F.3d 13, 51 (1st Cir.2007) (internal citations omitted).
Baraloto is not the victim of an isolated evidentiary error. The district court allowed at least seven witnesses to repeatedly opine about matters of which they had no personal knowledge. The aggregation of the errors in this case had a grave impact. As the district court acceded, this repetitive lay opinion testimony was “pertinent” to the Government proving both that Baraloto transacted in stolen goods and that he had personal knowledge the goods were stolen, see ante 266-67 — the two most contentious elements of the Government’s case. To boot, the Government’s proof that Baraloto knew the goods he transacted in were stolen rested entirely on circumstantial evidence. Without this testimony the Government’s case against Baraloto would have been flimsy at best.
The pervasive and impermissible use of lay opinion testimony in this case “so fatally infect[ed] the trial that [it] violated the trial’s fundamental fairness.” United States v. Basham, 561 F.3d 302, 330 (4th Cir.2009) (quoting United States v. Bell, 367 F.3d 452, 471 (5th Cir.2004)). The inadmissible testimony permeated the Government’s case and was the Government’s modus operandi for proving Baral-oto’s guilt. There was not a significant amount of evidence outside of the impermissible lay testimony inculpating Baralo-to. But cf. United States v. Banks, 482 F.3d 733, 741-42 (4th Cir.2007) (the substantial inculpatory evidence rendered any error harmless). The Government’s case was constructed around this testimony and the timeworn story it relayed. Pursuant to the cumulative error doctrine, therefore, the mountain of evidentiary errors in this case warrants a new trial.
V.
The lay opinion testimony in this case was not based on the witnesses’ first-hand perception as required by Rule 701. Instead, the testimony was an amassment of inferences capitalizing on an all-too-familiar story. Given the pervasive nature of the impermissible lay opinion testimony in this case, I would reverse and remand for a new trial due to evidentiary errors. I respectfully, but firmly, dissent.

 While Amanda Boothe's testimony may possibly be sufficient to fend off Baraloto's sufficiency of the evidence challenge, see ante 271 n. 4, this does not effect the harmless error analysis conducted below, see infra Part IV.